# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 7468 | **DATE** | 12/13/2004 |
| **CASE TITLE** | Caryn Struif vs. MK-I LLC; One Fish, Two Fish LLC; MK-II LLC; Red Fish, Blue Fish, LLC | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants' Motion for Summary Judgment

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached memorandum opinion and order, Defendants' Motion for Summary Judgment [Doc. No. 54] is GRANTED in part and DENIED in part.

(11) ■ [For further detail see order attached to the original minute order.]

No notices required, advised in open court.

No notices required.

Notices mailed by judge's staff.

Notified counsel by telephone.

Docketing to mail notices.

Mail AO 450 form.

Copy to judge/magistrate judge.

mvf(lc)    courtroom deputy's initials

number of notices

DEC 15 2004
date docketed

rbf
docketing deputy initials

date mailed notice

Document Number

Date/time received in central Clerk's Office    mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARYN STRUIF | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03 C 7468 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| MK-I LLC; ONE FISH, TWO FISH LLC; | ) | |
| MK-II LLC; RED FISH, BLUE FISH LLC | ) | **DOCKETED** |
| | ) | |
| Defendant. | ) | **DEC 1 5 2004** |

## MEMORANDUM OPINION AND ORDER

Before this Court is Defendants MK-I LLC; One Fish, Two Fish LLC; MK-II LLC; Red Fish, Blue Fish LLC's Motion for Summary Judgment. For the reasons set forth in the opinion below, defendants' motion is granted in part and denied in part.

## I. FACTS

In 1995, Michael Kornick was a managing partner of KDK Restaurant Group in Chicago, Illinois. KDK owned several Chicago restaurants, including Marché in the West Loop neighborhood. Kornick hired Caryn Struif for a position at Marché that same year. In 1996, Struif became general manager of Marché; she continued to report to Kornick. As general manager, Struif was responsible for all front of the house operations. "Front of the house" encompasses the area from the front door of a restaurant back to the kitchen door; everything else, including the kitchen, is called "back of the house." Struif worked the midshift, overseeing both lunch and dinner at the restaurant.

-1-



At Marché, junior managers, including Struif, shared a common loft area with desks as a workspace. Kornick had a private office that adjoined this common work area. To reach the junior managers' workspace, employees had to walk past Kornick's office door. On approximately three occasions, Struif saw Kornick changing out of his work clothes into his street clothes when she walked past his open office door. Struif regarded these three incidents as accidental.

At times, Kornick got angry at kitchen staff in the open kitchen at Marché and raised his voice. On one occasion, he threw a plate at a staff member. On another occasion, he berated an employee in view of the restaurant patrons. Struif and Kornick had arguments at Marché, but Kornick did not verbally abuse her.

Struif received a job offer from another restaurant in 1997, which would have paid her $125,000. At that time, Struif was making $52,000 at Marché. Struif asked Kornick what he thought of the offer; Kornick indicated he did not think it was the right position for her. Kornick also indicated that he was thinking of leaving Marché to open a restaurant of his own, and stated that he would like Struif to be his partner in that business.

In 1997, Kornick left Marché to work on developing his own restaurant. Late that year, Kornick asked Struif to come work with him on opening his restaurant, which became "mk–Chicago" restaurant. After leaving Marché, Struif briefly worked at Thyme restaurant in Chicago because Kornick had an agreement with KDK Restaurant Group that he would not work with ex-employees of Marché for a certain period of time after their resignation. Struif worked with Kornick informally during this time. mk–Chicago restaurant opened on November 23, 1998. Struif was employed as the general manager of mk–Chicago. In this role, Struif was responsible

for the management of the front of the restaurant, which excluded the kitchen and the non-everyday management of the restaurant as a whole. Struif received a salary of $75,000 per year and was entitled to a discretionary bonus.

In early 2001, based on the success of mk–Chicago, Kornick decided to explore opening a second, spin-off restaurant in the northern suburbs of Chicago. Northfield, Illinois, was selected for this second restaurant, which became mk North. Kornick intended mk North to have a more casual atmosphere than mk–Chicago restaurant. He explained to Struif that a manager would be promoted to General Manager of mk–Chicago restaurant, and a General Manager would be hired for the new restaurant. Both parties agree that the person hired to be the General Manager of mk North was underqualified for the position.

Struif was offered, and she accepted, a senior managerial position at mk North, in which she would oversee both General Managers. The parties dispute her exact title and the parameters of her duties, but agree that she at least had responsibility, including hiring and firing authority, for the front of the house operations. Struif's pay rate continued to be $75,000 per year. The parties again dispute whether Struif continued to have responsibilities at mk–Chicago restaurant. Struif claims she did, but that Kornick required her to fulfill them on her "own time"; Kornick contends that she had been directed to work only at mk North.

mk North opened in August 2001. Between August 2001 and July 2002, MK-II LLC, which owned and operated mk North, made no distributions to its members. It appears that mk North was not immediately successful, had higher-than-average personnel turnover, and was unable to repay its investors as scheduled.

### A. Ownership of mk–Chicago and mk North

mk–Chicago restaurant is owned and operated by MK-I LLC, which is an Illinois limited liability company with a principal place of business in Chicago, Illinois. The managing member of MK-I LLC is a company called One Fish, Two Fish LLC ("One Fish"), which is also an Illinois limited liability company with a principal place of business in Chicago, Illinois. Michael Kornick was the only member of One Fish at its inception. Struif became a member of One Fish over a two year time period, with an 18.2% interest therein, which permitted her to participate in the profits from mk–Chicago restaurant. During the term of her employment, including the time that she spent working at mk North, Struif received all of her paychecks from MK-I LLC. Struif also received distribution checks from One Fish over the course of her employment.

mk North is owned and operated by MK-II LLC, which is a "duly organized and existing Illinois limited liability company," and which was formed for the purpose of operating the restaurant. (Def.'s 56.1 Facts ¶ 16; Pl.'s 56.1 Resp. Facts ¶ 74.) As with MK-I LLC, the managing member of MK-II LLC is another limited liability company. In this case, the managing member is a company called Red Fish, Blue Fish LLC ("Red Fish"), which, like MK-II LLC, is a "duly organized and existing Illinois limited liability company." MK-II LLC's business is the ownership and operation of mk North restaurant, located in Northfield, Illinois. Kornick and his wife, Lisa Koch, are members of Red Fish.

MK-I LLC and MK-II LLC are separate entities. One Fish and Red Fish are likewise separate entities.

## B. Struif and Kornick's interactions at the mk restaurants

In their planning discussions for mk–Chicago restaurant, Struif and Kornick agreed that they wished to establish a professional workplace environment. Waiters were to wear uniforms and strict employee policies would be observed. Employee training at mk–Chicago restaurant was described as "intense." During the staff training and the opening of mk–Chicago restaurant, Kornick's demeanor was reserved and professional. As time passed, however, he became more difficult. He began to yell and scream at cooks in the kitchen when angry. On two separate occasions in late 2001 or early 2002, Kornick became very angry with the executive sous chef at mk North, James Chapman, and verbally berated and physically grabbed Chapman. Chapman discussed his unhappiness about the incidents with Struif, who then did "damage control" with Kornick. Both mk–Chicago restaurant and mk North lost employees because of Kornick's behavior. (Def.'s 56.1 Reply ¶¶ 284-85.) mk North lost two chefs in quick succession shortly after opening.

On occasion during her employment with Kornick, Struif was present in Kornick's office while Kornick was changing his clothes. It was Kornick's practice to change from his street clothes to his chef outfit and vice versa in his office at both mk restaurants. Although Kornick had a private office at both restaurants with a door that could both close and lock, he did not always close his door when he changed clothes. Kornick and Struif dispute the number of times she was present when he was changing clothes. He contends it occurred infrequently and always by accident; she asserts it was frequent and that often Kornick would summon her to his office for a meeting, during which he would change his clothes.

Throughout her employment at both mk restaurants, Struif contends, Kornick permitted and participated in discussions of a lewd or sexually explicit nature. Other employees testified that sexual comments were common. In particular, Struif claims Kornick made sexual comments about a host at mk North, described how members of his household walked around naked, described a striptease party he attended in Las Vegas, and told Struif on more than one occasion that his wife was going to give a "sympathy blow job" to the restaurants' attorney because he did not get enough sex at home. Struif also maintains that Kornick made recurrent comments to her about her engagement and marriage, and about the negative effect that marriage and motherhood would have on her productivity as an employee.

Early in the development of mk North, Kornick retained a consulting firm, TLC Hospitality Group, to assist with the development and operation of the new restaurant. TLC consultants were present at mk North from the beginning. The corporate chef at mk North, Bernard Laskowski, testified that TLC provided information and analysis on the kitchen operations. It is disputed whether TLC provided similar information for front of the house operations.

In early 2001, Struif got engaged. Kornick hosted Struif's rehearsal dinner at mk–Chicago restaurant, after Struif inquired about holding the dinner at the restaurant. The cost of the dinner was charged against the restaurant and not against Kornick personally. During her engagement and after her marriage, Struif and Kornick talked about her desire to have children and about the effects of parenthood on female employee performance and job security. The content of these conversations is disputed, but both parties agree that some discussion occurred. Struif contends Kornick told her repeatedly that once she became a married woman, she would want to get

pregnant, and that once she got pregnant, she could no longer be an effective employee. Kornick denies making such statements.

Over the course of 2001, the working relationship between Struif and Kornick began to deteriorate. After Struif's marriage in late October 2001, she and Kornick had a dispute about whether Struif should act as the closing manager of mk North, which would require her to stay at the restaurant until ten or later in the evening. Struif questioned the need for her to close the restaurant on a regular basis. She asserted that she had "paid her dues" with regard to closing restaurants and should not have to do it on a regular basis. Struif believed that it was most productive for her, as a senior manager, to be present at mk North for the majority of the lunch and dinner services. Although she liked to close on occasion so that she could observe the restaurant at the end of the evening shift, she did not believe it was productive for her regularly to remain at the restaurant until ten in the evening. The issue of whether Struif would be the closing manager at mk North became a "big issue" for Kornick, and he continued Kornick continued to assign Struif to the closing shift up to the time she was terminated. Struif testifies that she worked the closing shift when assigned, even when she was also assigned the opening shift on the following morning. Kornick has not presented credible evidence that Struif ever refused to work an assigned shift. Kornick alleges that Struif arrived for work late and left early, but provides only an affidavit stating that Struif arrived and left at times consistent with the midshift, which is the shift she most often worked. Moreover, Struif had reached a level of senior management at which she was no longer expected to clock in or out, but rather to work the hours necessary. Laskowski, the corporate chef at both mk restaurants, testified in his deposition that he could not recall a time when Struif was not at mk North when she needed to be there.

In late 2001, Struif's review of the financial records of mk–Chicago restaurant revealed that Kornick was withholding distribution of funds from mk–Chicago restaurant to the members of MK-I LLC, including One Fish, in which she had a membership stake. Kornick continued to withhold distributions from the members of MK-I LLC from 2001 until at least the date of Struif's termination.

During the first half of 2002, Kornick criticized Struif's performance in conversations with his corporate chef, Laskowski, asking why she wasn't at the restaurant sometimes. From the record, however, it is unclear that Struif was actually scheduled or expected to be at the restaurant at those times.

During late spring 2002, Laskowski questioned Kornick about the financial status of the restaurants. Specifically, he asked why he, as a member of both One Fish, Two Fish LLC and Red Fish, Blue Fish LLC, had not received a distribution, despite Kornick's assurances that he would receive payments. Laskowski testified that Kornick explained he was holding back distributions because he was "looking to get [Struif] out of the company" and he wanted to limit the percentage she could receive in distributions.

In June 2002, the executive sous chef of mk North, James Chapman, gave notice and informed his supervisor, Bernard Laskowski, that he had accepted a position with another restaurant co-owned by two long-time friends. Kornick called Struif when he learned of Chapman's resignation; he was very angry and informed Struif that she could either convince Chapman to retract his resignation, or she leave with him. Struif attempted to explain that she had played no role in Chapman's departure, and that the third co-owner of the new restaurant,

who was a friend of Struif's, had played no role in recruiting Chapman. Kornick maintained that Struif had breached her duty of loyalty to him in connection with Chapman's resignation.

On July 9, 2002, Kornick called Struif to his office at mk North for a meeting. Kornick's wife, Lisa Koch, was also present. At the meeting, Kornick informed Struif that he had decided to end their partnership. Struif expressed shock, and Kornick told her he could understand her shock. Struif contends that she asked if she was being fired "for cause," and that Kornick replied, "No, we've just grown apart." Kornick did not fill Struif's position after she was terminated. Struif alleges that Kornick distributed the money that would have paid her salary to himself, and, in lesser amounts, his wife and the general manager of mk–Chicago.

On March 17, 2003, Struif submitted a Charge of Discrimination to the Illinois Department of Human Rights, alleging that she had been subjected to sex discrimination during her employment at mk–Chicago restaurant and mk North. This discrimination charge was simultaneously cross-filed with the Equal Employment Opportunity Commission ("EEOC"). Specifically, Struif charged that Kornick sexually harassed her "throughout [her] employment" and that, after her engagement, Kornick made comments about how marriage and motherhood would affect her work performance. The EEOC gave Struif a Right To Sue letter on or about August 10, 2003. Struif filed the instant suit on October 22, 2003.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, and answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 573 (7th Cir.

2003). In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in her favor. See Haywood v. Lucent Technologies, 323 F.3d 524 (7th Cir. 2003). A non-moving party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. McMillian v. Svetanoff, 878 F.2d 186, 188 (7th Cir. 1989). The Court will accept the non-moving party's version of a disputed fact if that position is supported by relevant, admissible evidence. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996).

## III.   ANALYSIS

### A.   Sex Discrimination

Plaintiff's suit alleges sex discrimination in employment. Her complaint can be broken down into two separate forms of sex discrimination, each of which will be considered. Specifically, she alleges sexual harassment through the creation of a hostile work environment, and sex discrimination through wrongful termination.

#### 1.   Hostile Work Environment/Sexual Harassment

The Title VII prohibition against sex discrimination protects employees from unwelcome sexual advances which are "sufficiently severe or pervasive enough to alter the conditions of the victim's employment and create an abusive working environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). A plaintiff does not have to show that the alleged sexual harassment involved any economic quid pro quo conditions, but rather that the conduct unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive work environment. Id. Moreover, the harassment is actionable only if it results in a

-10-

workplace that is both objectively and subjectively hostile. If the plaintiff did not perceive the work environment as hostile or abusive, or a reasonable person in the plaintiff's position would not have perceived it as such, then there is no protection under Title VII. Harris v. Forklift Systems, Inc., 510 U.S. 17, 20 (1993). A court will determine the severity and pervasiveness of harassment by evaluating all of the circumstances, including "the frequency of the discriminating conduct, its severity, whether it is physically threatening or humiliating and whether it unreasonably interferes with the worker's performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998). This inquiry "takes a middle path" between two possible extremes: on the one hand, making any offensive conduct actionable; and on the other, making only conduct that causes tangible injury actionable. See Harris, 510 U.S. at 22. Determining where the boundaries of actionable hostile conduct lie can be a complicated endeavor. Robinson v. Sappington, 351 F.3d 317, 329-30 (7th Cir. 2003) ("It is not a bright line, obviously, this line between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other.").

### a. Continuing Violation Doctrine

Defendants first allege that they are entitled to summary judgment because plaintiff's claims are time-barred. Because Struif did not file her EEOC charge until March 17, 2003, defendants contend that her charge of discrimination is only timely if she can establish "some act of discrimination or harassment occurred after May 21, 2002." (Defs.'s Mot. for Summ. J., at 8.) In general, a plaintiff in a federal employment discrimination case must file a charge of discrimination with the EEOC within 180 days of the unlawful employment practice underlying the complaint. 42 U.S.C. § 2000e-5(e). Illinois, however, is a "deferral state," which grants an

extension for plaintiff to file her charge until 300 days after the "alleged unlawful employment practice." Gilardi v. Schroeder, 833 F.2d 1226, 1230 (7th Cir. 1987); Boebel, 2004 WL 144135, at *2. In most circumstances, acts that occur more than 300 days before the employee files a discrimination charge will be deemed time-barred. Gilardi, 833 F.2d at 1229-33.

The continuing violation doctrine, which has evolved to address the often cumulative nature of hostile work environment claims, permits a plaintiff to recover for acts that occurred outside the statutory limitations period. Courts have recognized, however, that hostile work environment claims "are based on the cumulative effect of individual acts," Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). Indeed, the Supreme Court has held that an employer may be liable for all acts that are part of the single hostile work environment claim. Thus, the employee need only file a charge within 300 days of any one act that is part of the hostile work environment. Boebel, 2004 WL 144135, at *3 (citing Morgan, 536 U.S. at 118). But if some acts occurred outside the limitations period, e.g., more than 300 days before the act that gave rise to the discrimination charge, they must be connected in some way to the triggering event. A significant gap in time between the act that triggered the discrimination charge and any acts outside the limitations period may bar Plaintiff from relying on or recovering for the acts that occurred outside the limitations period. See Garrison v. Burke, 165 F.3d 565, 570 (7th Cir. 1999). Plaintiff can receive relief for a time-barred event by demonstrating a connection between it and another event that falls within the limitations period. Doe v. R.R. Donnelly & Sons Co., 42 F.3d 439, 445 (7th Cir. 1994).

Struif alleges that Kornick undressed in front of her on a recurrent and frequent basis. Neither party has established a significant gap in time between the triggering act and the other

acts on which Struif seeks to base her hostile work environment claim. In fact, when asked by defendant's counsel why she had not filed a complaint with the EEOC prior to her termination, Struif responded that the situation "built over the years." (Struif Dep., Sept. 20, 2004, at 398.)

Plaintiff also asserts that she can establish an act of harassment within the statutory period. During her deposition, Struif testified that she remembered one instance when Kornick undressed before her at mk North in 2002. When pressed to give a specific date of this conduct, Struif said "I don't remember when. I'm sorry."

> Q: So it could have been January, February, March, April –
> A: May or June.
> Q. (Continuing) – April, May, June, July, but you just can't remember?
> A: I really don't remember when. (Struif Dep., Sept. 20, 2004, at 103.)

It is unclear to this Court from the deposition transcript what Struif meant when she said "May or June." Plaintiff asserts that this was the date on which the conduct occurred. Defendant, predictably, asserts that Plaintiff could not remember when the conduct occurred. A third inference is that she was merely finishing the interrogator's question. When deciding a summary judgment motion, the court will make all reasonable inferences in the non-movant's favor. Here, a reasonable fact finder could find that Struif testified that the clothes-changing incident occurred within the statutory limitations period. Moreover, Struif asserts that the discriminatory act for the purposes of the EEOC time limitation was her termination on July 9, 2002, which falls well within the 300-day time period required. This Court therefore finds that, for purposes of this motion, Struif has satisfied the requirement of establishing that at least one act of harassment occurred within the 300 day period of her discrimination charge.

There are three considerations a court may use to determine whether a continuing violation exists: (1) the relatedness of the subject matter of the alleged acts or conduct; (2) the frequency of the acts or conduct complained of; and (3) their degree of permanence. See Selan v. Kiley, 969 F.2d 560, 565 (7th Cir. 1992). Each of Struif's allegations involves sexual harassment that created a hostile work environment; thus, she has satisfied the relatedness consideration. The frequency consideration also supports finding a continuing violation. The conduct complained of continued during Struif's employment with Kornick, though the frequency is disputed. The degree of permanence consideration examines whether the act complained of should have made an employee realize she had a duty to assert her rights. Reinhard v. Clark Products, Inc. No. 96 C 4784, 1997 WL 786667, at *5 (N.D. Ill. Dec. 12, 1997). In the context of sexual harassment, it is unusual to find significant permanence because each individual act is often insufficient to make plaintiff recognize that she faces illegal discrimination. In other words, conduct that may have seemed innocent when done, may become more sinister in light of subsequent (harassing) acts. Thus, in balancing these three considerations, this Court cannot say that these facts preclude a determination of continuing violation, and finds that Struif has presented sufficient evidence of a cumulative patter of discrimination to establish a continuing violation.

### b.    Single Employer Doctrine

Defendant next invokes the "single employer" or "integrated enterprise" doctrine and argues that Struif cannot establish that she was employed by a single employer during the entire time period of which she complains. Defendant relies on the formal corporate structures of the entities that own the two restaurants. MK-I LLC, which owns and operates mk–Chicago, is not a part of MK-II LLC, which owns and operates mk North. When Struif moved from mk–Chicago

to mk North, defendant claims, she switched employers. Therefore, according to the defendant, her hostile work environment claim is barred.

The question of who employed Struif and when is disputed. Defendants allege that MK-I LLC employed Struif when she worked at mk–Chicago, but that MK-II LLC employed her when she moved to mk North. (Defs.' Mot. for Summ. J. at 5 ("Struif was no longer an employee of MK Restaurant – Chicago [sic] by, at the latest, January 2002.") Therefore, defendants argue, Struif had two separate employment relationships, one with MK-I LLC and a second with MK-II LLC. Plaintiff argues that MK-I LLC wrote her paychecks up until her termination, and that she never signed an employment agreement with MK-II LLC. Given the conflict between the parties' understanding of Struif's employment relationship with Defendants, and the significant confusion that the relationship between the various LLCs created for parties' counsel (see, e.g., Struif Dep., Sept. 20, 2004), this Court finds that the question of who employed Struif and when remains a disputed issue of material fact. A reasonable finder of fact could determine, however, that Struif had a single employment relationship with the Defendants. For the purpose of this summary judgment motion, this Court treat the Defendants as a single employer.

### c.    Prima Facie Case

The required elements of a prima facie case for a hostile work environment claim are: "(1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on [plaintiff's] sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is

a basis for employer liability." <u>Hall v. Bodine Elec. Co.</u>, 276 F.3d 345, 355 (7th Cir. 2002) (quoting <u>Parkins v. Civil Constructors of Ill., Inc.</u>, 163 F.3d 1027, 1032 (7th Cir. 1998)).

### (1)    Unwelcome Sexual Harassment

Struif alleges that Kornick repeatedly harassed her by undressing and changing from his street clothes to his chef's outfit (or vice versa) while she was in his office for meetings to discuss restaurant business. At times, he undressed down to his boxer shorts. Struif asserts that Kornick frequently left his office door open when he was changing clothes, although his offices at both mk–Chicago and mk North had doors that could lock. On the occasions when she walked into Kornick's office while he was changing, she maintains, she would leave and return later. If, however, she was already present in his office when Kornick began to change clothes, Struif states that she often objected to his disrobing, but that her objections were ignored and Kornick continued to change in front of her. In addition, Struif asserts that Kornick allowed and participated in graphic workplace discussions of sexual acts and events throughout her employment, and that such commentary increased after Kornick began consulting on a restaurant in Las Vegas in April 2002. She characterizes Kornick's conversation as "coarse" and having "heavy sexual content." On one occasion, he described a pool party he attended in Las Vegas where topless dancers had also been present. On another occasion, he told Struif that he and his wife had had sex in one of the rooms at Struif's wedding reception. Struif contends that she objected to such comments, and when her objections were ignored, often walked away from such conversations.

This Court finds that a reasonable jury could conclude that Struif found Kornick's conduct and commentary unwelcome. It is clear that there was a sexual nature to the

commentary. With regard to Kornick's clothes-changing, there is sufficient evidence for a finder of fact to conclude that it also was a form of unwanted conduct of a sexual nature. Kornick was Struif's supervisor; the incidents occurred in his office, often at the end of the day; and Kornick continued the practice even after Struif objected. For these reasons, Struif has met the first element of her *prima facie* case of sexual harassment.

### (2) Harassment Based On Sex

The second required showing in plaintiff's *prima facie* case is that the sexual harassment was based on plaintiff's sex. The "critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998) (citation omitted). Here, Struif argues that Kornick engaged in the verbal and physical conduct of which she complains because of her sex. Struif contends that Kornick "liked to undress in front of her partly because she was a woman and because it was intimidating to her as a woman." (Struif Dep., Sept. 20, 2004, at 97.) Defendants allege that other, male, employees also saw Kornick changing his clothes at the mk restaurants. However, no evidence suggests that male employees were called into Kornick's office on a regular basis for meetings at which Kornick would disrobe, over their objections. Based on the evidence presented, a reasonable fact finder could determine that Kornick engaged in this conduct because of Struif's sex. For the purposes of this motion, this Court finds that Struif has satisfied the second element of her *prima facie* case.

### (3) Unreasonable Interference With Work Environment

In order to recover under her sexual harassment claim, Plaintiff must demonstrate that, under the totality of the circumstances, the harassment rendered her work environment abusive or

hostile. Hildebrandt v. Ill. Dept. of Nat'l Resources, 347 F.3d 1014, 1033-34 (7th Cir. 2003). To be actionable under a hostile work environment theory, sexual harassment must be "sufficiently severe or pervasive [so as] to alter the conditions of employment and create an abusive working environment." Chalmers v. Quaker Oats Co., 61 F.3d 1340, 1345 (7th Cir. 1995). Courts do not require the plaintiff to show that her work environment became psychologically injurious as a result of the harassment. Harris, 510 U.S. at 22.

To be actionable, a hostile work environment must be both subjectively and objectively hostile. That is, the employee believed the workplace was hostile; and a reasonable person in the employee's position also would have found the environment hostile. Courts will consider "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" in determining whether a hostile work environment existed. Harris, 510 U.S. at 23. The Seventh Circuit has held that situations involving isolated events of harassing behavior by a supervisor are insufficient to support a hostile work environment claim. See, e.g., Koelsch v. Beltone Electronics Corp., 46 F.3d 705, 708 (7th Cir. 1995). By contrast, the Seventh Circuit has found that isolated events combined with ongoing or recurring harassing conduct can give rise to an objectively hostile work environment.

In this case, Struif alleges that not only did Kornick engage harassing conduct towards her, but he also harassed her continually over the course of her four-year employment at mk–Chicago and mk North. Kornick not only summoned her to meetings during which he would disrobe over her complaints or protests, but did so continually. After Struif's engagement, she alleges, Kornick also regularly made comments that disparaging women who married, and

-18-

particularly, women who got pregnant as being unwilling to work and ineffective employees. In addition, Kornick described parties he had attended where topless dancers were present, and described sexual acts between himself and his wife at plaintiff's wedding reception and at mk–Chicago restaurant. Plaintiff's evidence, considered in the light most favorable to her, establishes a genuine issue of material fact for trial on the existence of a hostile environment claim.

### (4)     Basis For Employer Liability

Finally, plaintiff must show a basis for employer liability in order to make out her *prima facie* case of hostile work environment sexual harassment. "Employer liability for hostile environment sexual harassment hinges on whether the harasser is the victim's supervisor or merely a co-employee." Hall, 276 F.3d at 355. "An individual is not a supervisor unless he possesses the authority to *directly* affect the terms and conditions of a victim's employment." Hall, 276 F.3d at 355. It is clear in this case that Kornick was Struif's supervisor. Kornick hired her at mk–Chicago and offered her the position at mk North. He supervised her work performance, although the parties disagree on how close or cogent his supervisory skills were. Finally, he fired her. For these reasons, Struif has established a basis for employer liability under Title VII.

### 2.     Sex Discrimination Via Wrongful Termination

Defendant also alleges it is entitled to summary judgment on Plaintiff's sex discrimination claim. Struif contends she was unlawfully terminated because of her sex, in violation of Title VII.

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff has two avenues by which she can satisfy her burden of proof: the indirect, burden-shifting method from McDonnell-Douglas, or the direct avenue of presenting evidence, either direct or circumstantial, of discriminatory intent. Hildebrandt, 347 F.3d at 1029. Direct evidence is evidence that, if believed, would prove the fact in question "without reliance on inference or presumption." Walker v. Glickman, 241 F.3d 884, 888 (7th Cir. 2001) (citation omitted). Direct evidence therefore "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000). It is, consequently, increasingly uncommon in contemporary American society. Circumstantial evidence is evidence "that allows a jury to infer intentional discrimination by the decisionmaker." Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003) (citations omitted).

If plaintiff cannot establish direct or circumstantial evidence of intentional discrimination, then she must proceed under the McDonnell-Douglas burden-shifting indirect method of proof. Dandy v. United Parcel Service, 388 F.3d 263, 273 (7th Cir. 2004). The court first must determine whether Plaintiff satisfied her *prima facie* case requirements. To establish a *prima facie* case of sex discrimination based on wrongful termination via the indirect method, a plaintiff must prove that: (1) she is a member of a protected class; (2) at the time of her termination, she was meeting her employer's legitimate employment expectations; (3) despite her competent performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly

situated male employees. Peele v.Country Mut. Ins. Co., 288 F.3d 319, 326 (7ᵗʰ Cir. 2002). Once

the plaintiff establishes a *prima facie* case of sex discrimination, the burden shifts to the

employer to produce a legitimate, nondiscriminatory reason for terminating the employee. If the

employer offers a legitimate, nondiscriminatory reason, then the plaintiff has the burden of

rebutting that explanation by producing sufficient evidence to permit a trier of fact to find that

the employer's proffered reason is pretextual. A plaintiff first must establish a *prima facie* case of

sex discrimination, however, before she may reach the pretext analysis stage. Peele, 288 F.3d at

326-27.

### a. *Prima Facie* Analysis of Struif's Sex Discrimination Claims

Struif must meet the required elements of her *prima facie* case in order to proceed with

her sex discrimination claim. She is a woman, and thus, a member of a protected class. Struif

alleges that she was meeting Kornick's legitimate employment expectations at the time of her

termination. Kornick disputes her allegation, contending instead that she frequently arrived late

for work, left early, and refused to work the shifts he assigned. Struif responds that other

employees at mk North felt that she was meeting Kornick's expectations. Kornick argues that

Struif was disloyal and assisted James Chapman, mk North's executive sous chef, in finding a

job at a new restaurant. Struif contends that she did not know Chapman was being recruited by

another employer and that, in any event, it was Kornick's own abusive behavior that led to

Chapman's departure. Given the evidence presented and making reasonable inferences in favor

of the plaintiff, this Court finds that a fact finder could determine that Struif was meeting

Kornick's reasonable employment expectations.

Struif must also demonstrate that she suffered an adverse employment action, despite meeting her employer's reasonable employment expectations. Kornick terminated her on July 9, 2002, which satisfies the requirement of an adverse employment action.

Finally, Struif must demonstrate that she was treated less favorably than similarly situated male employees. Here, her *prima facie* case fails. Plaintiff is unable to establish that there were any other similarly situated employees. Kornick alleges he terminated Struif for insubordination for her refusal to work certain shifts, for tardiness, and for breach of loyalty. Even without considering the breach of loyalty claim, Struif cannot establish the existence of a similarly situated employee. To meet her burden, she would have to show that there was a male employee in a similar senior management position who also allegedly reported to work late, left early, and resisted working on certain shift assignments. Struif is unable to do this. Thus, her *prima facie* case fails. Summary judgment therefore is appropriate on Struif's sex discrimination claim.

### b.  Defendant's Legitimate Non-Discriminatory Reason

Assuming *arguendo* that Plaintiff had carried her burden of presenting a *prima facie* case of sex discrimination under the McDonnell-Douglas framework, the burden would then shift to the defendant to present a legitimate, non-discriminatory reason for its action. Once defendant offers such a reason, Plaintiff bears the burden of establishing that it was merely a pretext for the discriminatory animus. Hildebrandt, 347 F.3d at 1030. Defendant in this case alleges that Struif was terminated for poor job performance, including alleged insubordination and failure to make mk North a successful restaurant, and for breach of her duty of loyalty in the departure of James Chapman, executive sous chef. Struif counters that at the time he terminated her, Kornick told her that her termination was not "for cause," but rather because they had "grown apart." (Struif

-22-

Dep., Sept. 20, 2004, at 375.) However, Defendant is not required to present a persuasive reason, only to articulate a nondiscriminatory reason. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). The fact that Plaintiff argues the reason is factually incorrect is not relevant to her burden of persuasion. She is unable to establish that this reason is pretextual.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part. Plaintiff can proceed to trial on her claim of hostile work environment sexual harassment only.

Enter:

David H. Coar
United States District Judge

Dated: **December 13, 2004**